UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHIRLEY JANSEN,

                    Plaintiff,                                    Hon. Richard Alan Enslen

v.                                                    Case No. 1:07-CV-766

COMMISSIONER OF SOCIAL
SECURITY,

                    Defendant.

_____/

**REPORT AND RECOMMENDATION**

        This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C.

§ 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim

for Disability Insurance Benefits (DIB) under Title II of the Social Security Act.  Section 405(g)

limits the Court to a review of the administrative record, and provides that if the Commissioner's

decision is supported by substantial evidence, it shall be conclusive.

        Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges

to submit proposed findings of fact and recommendations for disposition of social security appeals,

the undersigned recommends that the Commissioner's decision be **reversed and this matter**

**remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision.  *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 49 years of age at the time of the ALJ's decision.  (Tr. 19).  She attended college for two years and worked previously as a buyer and sales/ordering clerk for her family's hardware business.  (Tr. 19, 99-100).

Plaintiff applied for benefits on April 1, 2003, alleging that she had been disabled since November 10, 2000, due to depression and anxiety.  (Tr. 63-65, 117).  Plaintiff's application was denied, after which time she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 33-62).  On May 5, 2005, Plaintiff appeared before ALJ William King, with testimony being offered by Plaintiff and vocational expert, James Lozer.  (Tr. 627-63).  In a written decision dated June 22, 2005, the ALJ determined that Plaintiff was not disabled.  (Tr. 18-32).  The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter.  (Tr. 6-9).  Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

### RELEVANT MEDICAL HISTORY

In November 1996, Plaintiff was arrested for drunk driving.  (Tr. 216).  She was subsequently ordered by a state court to either participate in in-patient treatment or go to jail.  (Tr. 216).  On February 21, 1997, Plaintiff was admitted to Kent Community Hospital to treat her alcohol "dependence."  (Tr. 151-52).  Plaintiff reported that she was drinking "one pint of vodka daily."  Plaintiff reported that she was experiencing depression, mood swings, panic, and anxiety.  (Tr. 151).  Plaintiff "left against medical advice" the following day.  (Tr. 151).  Plaintiff was re-admitted to Kent Community Hospital two days later.  (Tr. 155).  Plaintiff was "safely detoxified" and discharged on March 4, 1997.  (Tr. 155).

On March 27, 1997, Plaintiff began participating in out-patient therapy at the Samaritan Center of West Michigan.  (Tr. 216-18).  An initial assessment revealed that Plaintiff "has a severe and chronic alcohol problem" and "must stop drinking or die."  (Tr. 217-18).  Plaintiff acknowledged that she had consumed alcohol the previous day.  (Tr. 215).  Plaintiff was diagnosed with alcohol dependency.  (Tr. 218).  From March 27, 1997, through October 19, 1998, Plaintiff regularly (usually weekly) participated in counseling.  (Tr. 173-218).  During this time, Plaintiff remained sober, resumed working, and was "doing well."  (Tr. 173-218).

Treatment notes dated October 28, 1998, indicate that Plaintiff had resumed drinking.  (Tr. 172).  Plaintiff continued drinking, resulting in an increase in her psychological symptoms.  (Tr. 161-72).  On June 28, 1999, Plaintiff was "discharged from active treatment at her own request and against [her therapist's] advice."  (Tr. 161).  Plaintiff was informed that she would not be readmitted for treatment unless she was willing to abstain from alcohol.  (Tr. 161).

4

On November 29, 2000, Plaintiff was admitted to Kent Community Hospital to treat her alcohol "dependence." (Tr. 219-27). Plaintiff reported that for the past six months she had been drinking three-quarters of a pint of vodka daily. (Tr. 220). Plaintiff was discharged on December 2, 2000. (Tr. 222). When she was discharged, Plaintiff "refused to set up aftercare." (Tr. 222).

On January 8, 2001, Plaintiff was involuntarily admitted to Saint Mary's Hospital. (Tr. 228-41). She had quit work and was "drinking alcohol rather steadily." (Tr. 238). Plaintiff reported that she was drinking a pint of alcohol daily. (Tr. 230). She also reported that "she has been feeling depressed and sad since I started drinking heavily again in the last 1-1/2 months." (Tr. 229). Plaintiff was diagnosed with depression, alcohol abuse, and suicidal ideation. (Tr. 240).

Treatment notes dated January 11, 2001, indicate that Plaintiff "no longer requires the structure of an inpatient setting to protect herself, others or property or to determine or treat any significant changes and/or side effects from psychotropics." (Tr. 235). Plaintiff was discharged that day, at which time she was diagnosed with bipolar I disorder, mixed, severe with psychosis, and alcohol dependence. (Tr. 236). Her GAF score was rated as 55.[1] (Tr. 236). Plaintiff's prognosis was characterized as "good," so long as she takes her medication as instructed. (Tr. 235). That same day, Plaintiff began participating in out-patient therapy at Pine Rest Christian Mental Health Services. (Tr. 487-92).

Plaintiff was unable to remain sober, however, and was admitted to Kent Community Hospital on January 25, 2001. (Tr. 243-46). Plaintiff reported that she was drinking one-half pint

---

[1] The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994) (hereinafter DSM-IV). A GAF score of 55 indicates "moderate symptoms or moderate difficulty in social, occupational, or school functioning." DSM-IV at 34.

of alcohol daily and had last consumed alcohol earlier that day.  (Tr. 246).  The following day, Plaintiff reported that she "wants to leave," at which point she was discharged.  (Tr. 246).

On February 12, 2001, Plaintiff was admitted to Saint Mary's Hospital.  (Tr. 248). Plaintiff reported that she was depressed and felt tired "all the time."  (Tr. 248).  She also reported that she felt hopeless, helpless, and anxious.  (Tr. 248).  Plaintiff reported that "when she was not drinking for 2-1/2 years, she felt happy and was not depressed."  (Tr. 248).  Plaintiff reported that she was presently drinking one pint of alcohol daily.  (Tr. 248-49).  Plaintiff was discharged on February 15, 2001.  (Tr. 248).  Plaintiff was diagnosed with depressive disorder and alcohol dependence.  (Tr. 251).  Her GAF score was rated as 60.[2]  (Tr. 251).  Plaintiff's prognosis was characterized as "poor, unless she takes seriously her addiction to alcohol."  (Tr. 251).

Treatment notes dated March 2, 2001, reveal that Plaintiff "came to [therapy] session while intoxicated."  (Tr. 481).  Treatment notes dated March 15, 2001, indicate that Plaintiff was continuing to drink "mouthwash and vodka."  (Tr. 479).

On March 20, 2001, Plaintiff was arrested and jailed for drunk driving.  (Tr. 348).

On March 24, 2001, Plaintiff was admitted to the Hazelden Clinic following an "intervention" by Plaintiff's husband and other family members.  (Tr. 254).  Upon admission, Plaintiff reported experiencing "intense anxiety," as well as nervousness, hopelessness, helplessness, and difficulty relaxing and concentrating.  (Tr. 267).  Her GAF score was rated as 40.[3]  (Tr. 269).

---

[2]  A GAF score of 60 indicates "moderate symptoms or moderate difficulty in social, occupational, or school functioning." DSM-IV at 34.

[3]  A GAF score of 40 indicates that the individual is experiencing "some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."  DSM-IV at 34.

Plaintiff completed the treatment program and was discharged on April 21, 2001. (Tr. 253-329). At discharge, Plaintiff was diagnosed with (1) alcohol dependence with physiological dependence, (2) benzodiazepine dependence with physiological dependence, (3) anxiety disorder, and (4) substance induced mood disorder. (Tr. 254). Her GAF score was 55. (Tr. 256). Plaintiff was encouraged to "participate in individual psychotherapy to continue addressing her anxiety and to receive support for early recovery." (Tr. 256).

On May 16, 2001, Plaintiff reported that she "feels like the medication is helping." (Tr. 475). On May 30, 2001, Plaintiff acknowledged that she "has been drinking mouthwash." (Tr. 473). When confronted about this by her therapist, Plaintiff became "very hostile" and "angry," telling the therapist "to go fuck [herself]." (Tr. 473). On June 6, 2001, Plaintiff reported that she had consumed alcohol the previous Sunday. (Tr. 472). Plaintiff arrived for her June 12, 2001 therapy session "very drunk." (Tr. 471).

On August 12, 2001, Plaintiff began treating with Dr. Lawrence Probes. (Tr. 360-66). Plaintiff reported that she had experienced depression since adolescence. (Tr. 360). She reported that her psychotropic medications were not "effective." (Tr. 360). Plaintiff initially "denied problems with alcohol or any other chemical dependency." (Tr. 362). She subsequently "acknowledge[d] problems with alcohol," but claimed that "her drinking primarily is an attempt to relieve the symptoms of panic." (Tr. 362). Plaintiff's husband report that Plaintiff has "a severe alcohol problem and a history of abusing prescription drugs." (Tr. 362).

Plaintiff appeared "very sad, tired and on edge." (Tr. 364). When Dr. Probes informed Plaintiff that he "would not be prescribing Klonopin or other benzodiazepine medications,

her anxiety increased, and she began going in more detail into why she thought Klonopin would be helpful." (Tr. 364). The doctor modified Plaintiff's medication regimen. (Tr. 365-67, 372).

Plaintiff reported some initial difficulties after her medication regimen was modified, but on November 13, 2001, Plaintiff reported that her "mood swings are better and she doesn't have the overwhelming fear she used to get." (Tr. 354-59). On December 11, 2001, Plaintiff exhibited a "bright affect and good mood." (Tr. 353). Plaintiff also reported that "she wakes up and feels like she has energy." (Tr. 353). On November 19, 2001, Plaintiff reported that she was volunteering at her children's school and that "things are going well." (Tr. 465). On December 10, 2001, Plaintiff reported that she was "doing ok." (Tr. 464).

On March 12, 2002, Plaintiff reported that she was not experiencing depression, racing thoughts, panic attacks, or anxiety. (Tr. 349). She also stated, "I feel more like myself." (Tr. 349). Treatment notes dated April 22, 2002, indicate that Plaintiff's GAF score was 65.[4] (Tr. 456). Plaintiff subsequently began requesting that Dr. Probes prescribe a benzodiazepine to treat her anxiety. (Tr. 345-47). On June 3, 2002, Dr. Probes reported that he was "reluctant" to do so without a "supporting opinion from another clinician, a psychologist or addictionologist." (Tr. 345).

Two days later, Plaintiff began treating with Dr. Philip Fox. (Tr. 383-85). The doctor prescribed Xanax, a benzodiazepine, for Plaintiff. (Tr. 382). Treatment notes dated August 1, 2002, indicate that Plaintiff had attempted to obtain "refills on her Xanax, well before the one-a-day dosage was to be used up." (Tr. 380). The pharmacy reported that Plaintiff had attempted to obtain refills of these medication "at odd times when [Dr. Fox's] office was closed and they couldn't contact [Dr.

---

[4] A GAF score of 65 indicates that the individual is experiencing "some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 34.

Fox]." (Tr. 380). Plaintiff was subsequently able to locate a different doctor to approve a refill of her Xanax prescription. (Tr. 379). On August 13, 2002, Dr. Fox concluded that he "could not treat [Plaintiff] anymore because of her unwillingness to comply to treatment recommendations." (Tr. 379). The doctor also reported that he "did not think that [Plaintiff] could get better until she confronted this addictive pattern of use and thinking." (Tr. 379).

On September 5, 2002, Plaintiff began treating with Dr. Michael Thebert. (Tr. 453-55). Plaintiff reported that was experiencing depression, panic episodes, irritability, sadness, lack of energy or motivation. (Tr. 453). Plaintiff reported no physical complaints. (Tr. 454). Plaintiff appeared sad and unhappy and her thought content was "appropriate," but "depressed." (Tr. 454). Plaintiff did not exhibit any "bizarre behaviors, or other indicators of psychotic process." (Tr. 454). Plaintiff was diagnosed with major depressive disorder (recurrent) and alcohol dependence. (Tr. 454). Her GAF score was rated as 60. (Tr. 454).

On October 3, 2002, Plaintiff met with Dr. Thebert. (Tr. 452). Plaintiff exhibited signs of "mild depression," as well as "mild mania." (Tr. 452). Plaintiff reported that she had been experiencing "mood swings recently." (Tr. 452). The doctor modified Plaintiff's medication regimen. (Tr. 452). Treatment notes dated October 10, 2002, indicate that Plaintiff was "not doing well." (Tr. 451). Plaintiff reported experiencing racing thoughts and exhibited "signs of moderate depression." (Tr. 451). Dr. Thebert diagnosed Plaintiff with bipolar disorder (mixed) and alcohol dependence, and again modified her medication regimen. (Tr. 451). Treatment notes dated October 31, 2002, indicate that Plaintiff exhibited "inadequate treatment response." (Tr. 450).

On December 12, 2002, Dr. Thebert reported that Plaintiff exhibited a "partial response to treatment," but was still experiencing "episodes of depressed mood," sadness, irritability,

9

and "excessive worrying." (Tr. 449).  Treatment notes dated January 16, 2003, indicate that Plaintiff "is inadequately improved."  (Tr. 448). Following a January 30, 2003 examination, however, Dr. Thebert concluded that Plaintiff had resumed drinking "because she always has slurred speech." (Tr. 447).  Plaintiff also reported that she had taken 30 Fiorinal[5] tablets within the past week and, moreover, had taken Adderall[6] which was prescribed for her children.  (Tr. 447).

On February 5, 2003, Plaintiff telephoned Dr. Thebert "with extreme discomfort with what sounded like opioid withdrawal." (Tr. 446).  The doctor instructed Plaintiff to report to the emergency room, which she allegedly did.  (Tr. 446).  On February 6, 2003, Plaintiff met with Dr. Thebert. (Tr. 446).  The doctor reported that Plaintiff "is intoxicated with medication."  (Tr. 446).

The following day. Plaintiff was admitted to Forest View Hospital.  (Tr. 406-43).  On admission, Plaintiff appeared disorganized, psychotic, and depressed. (Tr. 431).  Her GAF score was rated as 10.[7]  (Tr. 438).  Plaintiff responded well to treatment and she was discharged on February 25, 2003.  (Tr. 406-43).  At discharge, Plaintiff's GAF score was rated as 40.  (Tr. 425).

On March 6, 2003, Plaintiff met with Dr. Thebert.  (Tr. 445).  The doctor reported that Plaintiff "seems in better mood and has clear thought process which she did not have when she

---

[5] Fiorinal is a potentially habit forming "pain reliever and sedative" used to treat "mild to moderate pain and tension headaches." *See* Butalbital, available at http://www.medicinenet.com/butalbital_with_aspirin_and_caffeine-oral/article.htm (last visited on July 22, 2008).  Fiorinal contains Butalbital, aspirin, and caffeine.  *Id.*  It has been observed that "Butalbital intoxication is indistinguishable from alcohol intoxication." and that "[s]ymptoms include sluggishness, lack of coordination, difficulty thinking, poor memory, slowness of speech and comprehension, faulty judgment, disinhibition of sexual and aggressive impulses, decreased attention, emotional lability, and an exaggeration of basic personality traits."  *See* Fiorinal, Fioricet, and other Butalbital Compounds for Headaches and Migraine, available at http://headaches.about.com/cs/druginfo/a/fiorinal_care.htm (last visited on July 22, 2008).

[6] Adderall is a central nervous system stimulant that is used to treat attention deficit hyperactivity disorder.  *See* Adderall, available at http://www.drugs.com/adderall.html (last visited on July 22, 2008).

[7] A GAF score of 10 indicates that the individual is experiencing "persistent danger of severely hurting self or others or persistent inability to maintain minimal personal hygiene or serious suicidal act with clear expectation of death."  DSM-IV at 34.

was last seen." (Tr. 445).  On April 24, 2003, Plaintiff met with Dr. Thebert.  (Tr. 499).  Plaintiff reported that she was feeling "more stable" and "much more clam and relaxed."  (Tr. 499).  Plaintiff exhibited "signs of mild depression," but "no signs of anxiety."  (Tr. 499).  Dr. Thebert reported that "recovery seems to be occurring."  (Tr. 499).

On April 29, 2003, Plaintiff completed a questionnaire regarding her activities.  (Tr. 93-98).  Plaintiff reported that she cooks, washes dishes, vacuums, washes laundry, dusts, irons clothes, mops, gardens, shops, and cares for her two children.  (Tr. 96).  Plaintiff reported that she can stand for 30 minutes, sit for 2 hours, and lift 50 pounds.  (Tr. 95).

On July 24, 2003, Plaintiff met with Dr. Thebert.  (Tr. 581).  Plaintiff appeared "more relaxed and happy than she has in the past."  (Tr. 581).  Plaintiff reported that "her mood has been mildly down at times," with "no sign of mania."  (Tr. 581).  The doctor concluded that Plaintiff's "symptoms seem to be resolving."  (Tr. 581).  Following a November 6, 2003 examination, Dr. Thebert reported that "recovery seems to be occuring."  (Tr. 578).Treatment notes dated December 18, 2003, indicate that Plaintiff was "stable."  (Tr. 577).

On February 5, 2005, Plaintiff met with Dr. Thebert.  (Tr. 576).  Plaintiff reported that "her mood has been stable most of the time recently."  (Tr. 576).  The doctor reported that Plaintiff "describes no depressive symptoms" and "describes no symptoms of mania."  (Tr. 576).  Dr. Thebert described Plaintiff's mood as "entirely normal with no signs of depression or mood elevation."  (Tr. 576).  Treatment notes dated July 15, 2004, reveal that "improvement is occurring."  (Tr. 569).  Treatment notes dated August 12, 2004, indicate Plaintiff was exhibiting "improvement."  (Tr. 567).  She continued treating with Dr. Thebert, exhibiting a positive response to treatment.  (Tr. 606-09).

11

On March 3, 2005, Plaintiff met with Dr. Thebert. (Tr. 605). Plaintiff reported that she was "feeling relatively well." (Tr. 605). The doctor reported that Plaintiff "seems to be stabilizing." (Tr. 605).

On March 23, 2005, Plaintiff was admitted to Saint Mary's Hospital. (Tr. 610-15). Plaintiff reported that she was experiencing increased depression. (Tr. 610). The results of a mental status examination were unremarkable. (Tr. 611-12). Plaintiff immediately responded to a change in her medication regimen and was discharged on March 28, 2005. (Tr. 614-15). On discharge, Plaintiff's GAF score was rated as 57. (Tr. 615).

At the administrative hearing, Plaintiff testified that she can stand for 30 minutes and lift 40 pounds. (Tr. 647-48). She reported that "prolonged" sitting does not bother her. (Tr. 648). Plaintiff testified that she cooks, washes dishes, runs errands, washes laundry, makes beds, "cleans the house," works in her flower garden, goes to a gym to exercise "a couple of times" each week, reads novels, drives, socializes with friends, and regularly attends bible study. (Tr. 648-51, 654). Plaintiff reported that she cares for her children, helps them with their homework, attends their parent-teacher conferences, and drives them to soccer practice. (Tr. 651-53). Plaintiff also reported that twice a year, she and her husband vacation in the Dominican Republic. (Tr. 651).

## ANALYSIS OF THE ALJ'S DECISION

### A.  Applicable Standards

The social security regulations articulate a five-step sequential process for evaluating disability.  *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[8]  If the Commissioner can make a dispositive finding at any point in the review, no further finding is required.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a).  The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity.  *See* 20 C.F.R. §§ 404.1545, 416.945.

### B.  The ALJ's Decision

The ALJ determined that from November 10, 2000 (Plaintiff's alleged onset date), through June 30, 2003, Plaintiff's impairments satisfied the requirements of Section 12.09(B) (Substance Addiction Disorders) of the Listing of Impairments, thus rendering her disabled.  (Tr. 26). The ALJ also determined, however, that Plaintiff's drug and alcohol abuse was material to the finding that Plaintiff was disabled during this period of time.  (Tr. 31).

---

[8] 1.  An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2.  An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3.  If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4.  If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5.  If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

The ALJ further concluded that as July 1, 2003, Plaintiff suffered from the following severe impairments: (1) degenerative disc disease of the lumbar spine, (2) bipolar disorder, (3) alcohol dependence in full remission, and (4) history of polysubstance dependence. (Tr. 27). The ALJ determined, however, that these impairments, whether considered alone or in combination, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 27). The ALJ concluded that while Plaintiff could not perform her past relevant work, there existed a significant number of jobs which she could perform despite her limitations. (Tr. 27-31). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

### 1. The ALJ's Decision is Not Supported by Substantial Evidence

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

As noted above, the Commissioner has established a five-step disability determination procedure. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

14

With respect to Plaintiff's residual functional capacity, the ALJ determined that as of July 1, 2003, Plaintiff retained the capacity to perform work activities subject to the following restrictions: (1) she can lift/carry 50 pounds occasionally and 25 pounds frequently; (2) during an 8-hour workday with normal breaks, she can stand and/or walk for 6 hours; (3) during an 8-hour workday with normal breaks, she can sit for 6 hours; (4) she can perform unlimited pushing and/or pulling; (5) she can frequently climb, balance, kneel, crouch, and crawl; (6) she can only occasionally stoop; and (7) she can perform only simple, routine tasks. (Tr. 28). After reviewing the relevant medical evidence, the Court concludes that the ALJ's determination as to Plaintiff's RFC (regarding the period beginning July 1, 2003) is supported by substantial evidence.

The ALJ determined that Plaintiff was unable to perform her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert James Lozer.

The vocational expert testified that there existed at least 80,000 jobs which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 660-61). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990) (a finding that 2,500 jobs existed which the claimant could perform constituted a significant number); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988) (the existence of 1,800 jobs which the claimant could perform satisfied the significance threshold).

> a. The ALJ's Decision Regarding the Period November 10, 2000, through June 30, 2003, is not Supported by Substantial Evidence

Under federal law, an individual "shall not be considered to be disabled" if "alcoholism or drug addiction" is found to be "a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). In order to determine whether alcoholism or drug addiction constitutes a "contributing factor material" to the finding of disability, the ALJ must determine whether the claimant would be disabled "if [she] stopped using drugs or alcohol." 20 C.F.R. § 404.1535(b)(1); *see also, Parra v. Astrue*, 481 F.3d 742, 746-47 (9th Cir. 2007). This determination occurs at the conclusion of the five-step sequential process identified above. *See Wright-Hines v. Astrue*, 2008 WL 2400946 at *8 (W.D. Tenn., June 10, 2008) ("the drug and alcohol materiality determination is made only when the individual is first determined to be disabled and when there is also medical evidence of drug or alcohol addiction") (citing 20 C.F.R. § 404.1535); *Anglemyer v. Astrue*, 2008 WL 2242421 at *7 (W.D. Wash., May 30, 2008) ("[m]ateriality, however, only becomes an issue after the individual proves that he cannot perform

16

any substantial gainful activity considering all his impairments including drugs and alcohol"); *Parra*, 481 F.3d at 746-47.

To determine whether a claimant's drug or alcohol abuse is a "contributing factor material" to her disability, the ALJ is required to adhere to the following procedure:

> (b) Process we will follow when we have medical evidence of your drug addiction or alcoholism.
>
> (1) The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.
>
> (2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.
>
> > (i)   If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.
> >
> > (ii)  If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability.

20 C.F.R. § 404.1535(b).

In other words, the ALJ must first determine whether the claimant's impairments, including her drug and/or alcohol use, render her disabled. *Anglemyer*, 2008 WL 2242421 at *7. If such is the case, the ALJ must then determine whether, absent the effects of drug and/or alcohol use, the claimant's impairments are still disabling in severity. *Id.* As noted immediately above, in making this latter determination, the ALJ must "evaluate which of [the claimant's] physical and mental limitations. . .would remain if [the claimant] stopped using drugs or alcohol and then determine whether any or all of [the claimant's] remaining limitations would be disabling." 20 C.F.R. § 404.1535(b)(2); *see also, Tagger v. Astrue*, 536 F.Supp.2d 1170, 1177-78 (C.D. Cal. 2008).

The ALJ's decision that Plaintiff is not entitled to benefits for the period November 10, 2000, through June 30, 2003, is fatally flawed. As noted above, the ALJ found that from November 10, 2000, through June 30, 2003, Plaintiff was disabled, as her impairments satisfied the requirements of Section 12.09(B) of the Listing of Impairments. The ALJ further found, however, that Plaintiff's "drug and alcohol abuse is 'material' to the finding of disability." Thus, the ALJ concluded that Plaintiff was not entitled to benefits for this period of time.

As previously noted, the determination whether a claimant's drug and/or alcohol use is a "contributing factor material" to her disability does not occur until after the ALJ has completed the five-step sequential process described above. The ALJ, therefore, necessarily had to have concluded (at step two of the sequential process) that during the period from November 10, 2000, through June 30, 2003, Plaintiff suffered from one or more severe impairments in addition to her drug and alcohol abuse. The record certainly supports such a finding. In his decision, however, the ALJ failed to identify any such impairments. The ALJ also failed to determine which of Plaintiff's

18

limitations (if any) would remain if she stopped using drugs or alcohol and whether such limitations would be disabling in severity.

In sum, with respect to the time period November 10, 2000, through June 30, 2003, the ALJ has articulated his conclusion that Plaintiff is not entitled to benefits, but has failed to identify the complete (and necessary) factual basis for this conclusion. The ALJ's failure to make these necessary factual findings leaves the Court unable to determine whether the ALJ's conclusion that Plaintiff is not entitled to benefits for the time period November 10, 2000, through June 30, 2003, is supported by substantial evidence.

While the Court finds that the ALJ's decision in this respect fails to comply with the relevant legal standards, Plaintiff can be awarded benefits only if proof of her disability is "compelling." *Faucher v. Secretary of Health and Human Serv's*, 17 F.3d 171, 176 (6th Cir. 1994) (the court can reverse the Commissioner's decision and award benefits if all essential factual issues have been resolved and proof of disability is compelling). While this aspect of the ALJ's decision fails to comply with the relevant legal standard, there does not exist *compelling* evidence that Plaintiff was entitled to benefits during the time period in question. Moreover, as detailed above, there are several unresolved factual questions regarding Plaintiff's claim relative to this period. The Court is neither equipped nor permitted to make such factual findings in the first instance.

The Court recommends, therefore, that the Commissioner's decision be reversed and this matter remanded for further factual findings, including but not necessarily limited to, a determination of whether Plaintiff is entitled to disability benefits for the time period from November 10, 2000, through June 30, 2003.

b.  The ALJ's Decision Regarding the Period July 1, 2003, through the Date of Decision is Supported by Substantial Evidence

With respect to this period of time, Plaintiff asserts that the ALJ erred in two respects: (1) the ALJ failed to properly evaluate Plaintiff's non-exertional limitations, and (2) the ALJ failed to accord sufficient weight to Dr. Thebert's opinions.  The Court will address each argument in turn.

I.  The ALJ Properly Assessed Plaintiff's Non-Exertional Limitations

As Plaintiff correctly notes, federal regulations articulate a "special technique" that must be employed when evaluating a claimant's mental impairments.  20 C.F.R. § 404.1520a(a). Pursuant to this regulation, the ALJ is required to make a "specific finding as to the degree of limitation" in each of the following areas: (1) activities of daily living, (2) social functioning, (3) concentration, persistence, or pace, and (4) episodes of decompensation.  *Id.*

Plaintiff asserts that with respect to the period of time beginning July 1, 2003 the ALJ failed to assess her limitations in these four areas.  In his decision, however, the ALJ examined Plaintiff's mental impairments at length and expressly found that Plaintiff experiences moderate restrictions in the activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace.  (Tr. 29).  Immediately thereafter, the ALJ observed that Plaintiff "has required only one hospitalization since June 30, 2003," which the Court interprets as a finding that Plaintiff has suffered only one episode of decompensation.  (Tr. 29).  The Court, therefore, finds this argument to be without merit.

## II.  The ALJ Properly Evaluated Dr. Thebert's Opinion

On May 2, 2005, Dr. Thebert completed a report regarding Plaintiff's mental ability to perform work-related activities.  (Tr. 600-01).  The doctor reported that Plaintiff "encounters anxiety when dealing with people" and "would not be able to work with the general public on a regular basis."  (Tr. 600).  The doctor reported that Plaintiff "suffers episodes of depression that interfere with the ability to concentrate and maintain focus."  (Tr. 600).  Dr. Thebert reported that "some days [Plaintiff] can barely get out of bed and perform even basic functions."  (Tr. 601).  The doctor further observed that

> On a good day [Plaintiff] can adjust personally and socially in a normal manner.  But she can not generally do so.  In a work setting she would frequently be unable to attend work because of her depression.  She would miss at least one day of work per week on average.

(Tr. 601).

Plaintiff asserts that because Dr. Thebert was her treating physician, the ALJ was obligated to accord controlling weight to his opinions, which evidence her disability.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and his maladies generally possess significant insight into his medical condition.  *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).  Accordingly, the medical opinions and diagnoses of treating physicians are given substantial deference, and if such opinions and diagnoses are uncontradicted, complete deference is appropriate.  *See King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)).  The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

The ALJ concluded that Dr. Thebert's opinions were not "fully persuasive" because they were "not supported by his notes and observations subsequent to July 1, 2003 or by the claimant's self-described daily activities."  (Tr. 28).  This conclusion enjoys ample support in the record as detailed above.  Thus, there exists substantial evidence to support the ALJ's decision to accord less than controlling weight to the opinions expressed by Dr. Thebert in his May 2, 2005, report.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that the ALJ's decision is not supported by substantial evidence.  Specifically, the Court finds that the ALJ's determination that Plaintiff was not disabled during the time period from July 1, 2003, through June 22, 2005, is supported by substantial evidence.  The Court further finds, however, that the ALJ's decision that Plaintiff was not entitled to benefits for the time period from November 10, 2000, through June 30,

2003, is not supported by substantial evidence.   Accordingly, it is recommended that the Commissioner's decision be **reversed and this matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)** as detailed herein.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date:  August 7, 2008                    /s/ Ellen S. Carmody
                                          ELLEN S. CARMODY
                                          United States Magistrate Judge

23